**SPERRY RAND CORPORATION**

v.

**The UNITED STATES.**

No. 10–67.

United States Court of Claims.

March 16, 1973.

G. A. Chadwick, Jr., Washington, D. C., attorney of record, for plaintiff. Charles M. Chadwick, Chadwick & Titus, Washington, D. C., of counsel.

Michael B. Rosenberg, Washington, D. C., with whom was Asst. Atty. Gen., Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Harry E. Wood with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on November 3, 1972, with reference to Count I of the amended petition (consideration of Counts II and III having been postponed until after the disposition of Count I). The case is now before the court on the parties' joint motion, filed January 26, 1973, that the court adopt the commissioner's report as the basis for its judgment in the case and dismiss the amended petition as to Count I. The case is also before the court on plaintiff's motion, filed January 26, 1973 (and duly endorsed by the defendant as having "no objection"), to dismiss Counts II and III of the amended petition without prejudice. Upon consideration thereof, without oral argument, since the court agrees with the commissioner's opinion and recommended conclusion of law, as hereinafter set forth as well as the commissioner's findings of fact which are not reported here, the court hereby grants the motion of the parties and adopted the same as the basis for its judgment in this case as to Count I of the amended petition. Therefore, plaintiff is not entitled to recover as to said Count I and, as to it, the petition is dismissed.

The court further grants plaintiff's motion to dismiss as to Counts II and III of the amended petition and they are dismissed without prejudice.

## OPINION OF COMMISSIONER

WOOD, Commissioner:

This action, in three counts, arises from a 1956 fixed-price incentive type contract between plaintiff and defendant, acting through the Department of the Air Force, for the development, manufacture, production and delivery to defendant, at a total target price of some $15,300,000, of "certain AN/ASN-7 aircraft Navigation Systems."

Count I, grounded exclusively on the holding of this court in National Presto Indus., Inc. v. United States, 338 F.2d

99, 167 Ct.Cl. 749 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965), alleges a mutual mistake of fact as to the magnitude of research and development efforts required in contract performance, seeks reformation on that ground, and asks "that the additional costs incurred by [plaintiff] be allocated equitably between the parties hereto in the proportion that said additional costs represent actual research and development effort and benefited the follow-on contracts * * *." In Count I, seeking relief "exclusive of the Wunderlich Act", plaintiff prays for judgment of "not less than $2,938,116.62."

Counts II and III involve, respectively, the propriety of allocation (within ceiling price limits) of "engineering, research, design and development expenses incurred under" plaintiff's 1956 contract to certain follow-on contracts, and an allegation that plaintiff incurred extra costs in the performance of the 1956 contract because of changes. After lengthy trial, the Armed Services Board of Contract Appeals denied on the merits plaintiff's claim for "recoupment of R&D costs allocated to * * *" subsequent contracts (Count II), and plaintiff's claim of right to an equitable adjustment for six of nine asserted contract "extras" (Count III).[1] The parties agree that Counts II and III are subject to Wunderlich Act[2] review in this court.

At the outset, the parties engaged in vigorous and prolonged dispute respect-

ing plaintiff's entitlement to trial *de novo* on Count I. A commissioner's order filed December 5, 1969, held that absent agreement by the parties that determination of the issue presented by Count I be confined to the administrative record, that issue might be tried out, but urged that the court's observations in Air-A-Plane Corp. v. United States, 408 F.2d 1030, 187 Ct.Cl. 269 (1969), as to further proceedings be heeded.[3]

At the direction of the commissioner, counsel for the parties subsequently devoted considerable time and effort to reaching agreements in accordance with the court's observations in *Air-A-Plane*. Those efforts culminated in a commissioner's memorandum and order, filed February 24, 1971, incorporating two significant stipulations.

Pursuant to the first, the entire administrative record in ASBCA Nos. 8689 and 9951 was received in evidence on Count I, to be considered (subject to the decisions of the Supreme Court in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963) and related cases) as though offered and received at trial in this court.[4] The parties further stipulated and agreed, for purposes of Count I, that certain specified findings of fact made by the ASBCA were entitled to finality under the Wunderlich Act.[5]

In August 1971, trial on Count I, duly limited to the issues of law and fact relating to plaintiff's right to recover, was

---

1. ASBCA Nos. 8689 and 9951, 66–1 BCA ¶ 5403. The administrative record is voluminous. Finding 1(b).

2. 68 Stat. 81, 41 U.S.C. §§ 321–22 (1970).

3. The said order also reflected that a decision for plaintiff on Count I would remove any necessity to consider and decide Counts II and III, and that plaintiff had requested that further consideration of these counts be postponed until after the disposition of Count I. That request, being deemed just and proper, was thereby granted.

4. Each party reserved the right to object to any portion of the administrative record

on grounds of competency, relevancy, or materiality, and to offer additional testimony or exhibits.

5. The order set forth in 55 separately numbered paragraphs the findings of fact made by the ASBCA and entitled to finality, reserving to each party "the right (a) in its requested findings of fact and briefs to alter or revise either the order or the language of the said findings as they appear herein, and (b) to contend that any such finding, though made, is not relevant or material to the disposition of Count I."

held in Washington, D.C. Briefing of the case to the commissioner was completed July 13, 1972.

■ For reasons subsequently to be set forth, it is concluded that plaintiff is not entitled to recover on Count I.

The facts, most of which have been stipulated, are lengthy.

Prior to 1955, plaintiff [6] had developed a navigational computer known as the ASN-6, by the use of which a pilot could continuously read off his present position in terms of latitude and longitude. Late in 1955, a model of a combined, more sophisticated, system known as the OA-541(XA)/ASN-7 Service Test System was successfully flight tested. Findings 2-4.

The Department of the Air Force was interested in purchasing (and plaintiff was interested in selling) a production version of ASN-7. Finding 4. The Air Force, then mainly interested in the new system for use in high-speed fighter aircraft, desired the new system to be able to compute speeds up to 2,000 knots (rather than simply the 800-knot capability of the Service Test System), and to have an additional capability, the automatic computation of magnetic variation. Finding 5. The restricted space in a fighter plane, particularly in the cockpit, called not only for miniaturization of components in the new system, but also for remote location of mechanisms which had theretofore been directly geared to cockpit instruments. *Ibid.*

In March 1956, after free exchanges of communications between engineers for both parties, defendant prepared, and submitted to plaintiff for comments, a draft specification based on data and general layouts supplied to it by plaintiff. Finding 7. As a result of plaintiff's extensive written comments of Oc-

tober 16, 1956, on the draft, a revised specification (Mil-C-25528A, November 9, 1956) was issued by defendant. This revision was, in essence, the specification upon which Contract AF 33(600)–34124 (hereinafter Contract 34124), the contract in suit under Count I, was negotiated. Finding 9.

Although the dimensions of the seven "black boxes" [7] making up the ASN-7 were specified, and some of the contents were delineated, the contract specifications were largely performance, not design, specifications. Finding 10.

Contract 34124, executed effective November 16, 1956, was of the fixed-price incentive type. As the parties have heretofore treated it, it called for the delivery of some 500 ASN-7 sets. The total target price for the 57 categories of items covered by the contract, separately stated on the face of the contract and separately treated in the price revision clause, was some $15,300,000. Finding 13.

The contract was a production contract in name and in form, and as executed it accurately expressed the intent and agreement of the parties at that time. Findings 12, 14. In 1956 both parties visualized the contract as embodying "the relatively simple repackaging of an already developed and proved design into units capable of efficient production, and which could meet the somewhat more critical requirements for installation in operational aircraft." Finding 12.

Indeed, plaintiff had theretofore explicitly advised defendant that open manufacturing capacity existed, and that acceptance of its first proposal (submitted in response to defendant's request) would result in a "production supply contract". Finding 8.[8] Neither

---

6. Plaintiff is experienced both as a manufacturer of navigational computer systems and as a government contractor. Finding 1(a).

7. See Finding 11. A comparison of the boxes of the Service Test and ASN-7 systems is there set forth.

8. "Design engineering" (in defendant's terms) or "research and development" (in plaintiff's) of about $800,000 was within the contemplation of the parties at contract execution. Finding 8, n. 3.

party was aware, in 1956, that a research and development (R&D) effort of the magnitude and cost actually undertaken by plaintiff in connection with Contract 34124 would be involved. Findings 12, 26, 39.

Contract 34124 contained, in addition to the standard form of General Provisions for a supply contract, a "Fixed Price Incentive Clause" providing for revision, by negotiation after contract performance, of the target price on the basis of cost data submitted by plaintiff. A target profit to 10 percent of target cost was allowed, and this could be adjusted up or down depending on whether actual costs were less or greater than target cost. Final profit could not, however, exceed 15 percent of target cost, nor could final price exceed 110 percent of target price. Finding 15.

Contract 34124 called for delivery of three sets of first articles and test reports within 9½ months, with production deliveries to commence 1 month after first article approval and to be completed within approximately 10 months thereafter. Finding 14. Reliability requirements were not clearly spelled out in Contract 34124, nor did it contain a prescribed useful life for the ASN–7 sets. Finding 15. Contract 34124 did not contain a specific disclaimer of governmental liability to plaintiff, nor a specific warranty by plaintiff. Finding 42.

In January 1958, on the basis of tests on the initial first article sample, tentative approval of first articles was given, and plaintiff was provisionally authorized to deliver up to 63 production sets. Finding 18. Shipment of production units began February 28, 1958, and by the end of June 1958, approximately 60 sets, most of which defendant sent to Boeing Airplane Company for installation in KC–135 tankers then coming off the assembly line, had been delivered. In the meantime, on the basis of tests on the other two first article samples, un-

conditional first article approval had been given June 23, 1958. Finding 19.

As early as the middle of 1957 plaintiff had come to realize it had a cost problem on Contract 34124, and between then and the end of June 1958 it became increasingly aware of both financial and technical problems in connection with Contract 34124. Findings 20–22. At the end of May 1958 plaintiff made a complete reestimate of its cost situation with respect to Contract 34124 and the first follow-on contract (let as of November 1, 1957, with unit costs approximately 13 percent higher than those for Contract 34124), realized it faced a substantial loss,[9] prepared a cost reduction program, and prepared to make a presentation to the Air Force "for the purpose of recovering funds to offset the then anticipated loss." Finding 23. Because of the soon-to-be-described "Interregnum", however, the cost reduction program was shelved and the presentation to recover funds was deferred for about a year. *Ibid.*

While ASN–7 sets which passed plaintiff's own inspection met contract tests and were accepted by the Air Force, from the start of production early in 1958 plaintiff experienced an increasing in-house rejection rate. Finding 24. In March 1958, plaintiff assigned a task force to a study of the reasons for rejection. After Boeing began to complain to plaintiff, in June 1958, that sets furnished to Boeing by defendant were failing after brief use, it became apparent that major problems of design might be involved. Plaintiff made arrangements with Boeing to return to it the sets that had failed, and, on analysis, became convinced that if it were not to furnish defendant a marginal product that met specifications but proved unsuccessful in the field, a major reassessment of its manufacturing program, including the basic design of the sets, was called for. Finding 25.

9. In mid-1958 plaintiff was aware it faced a loss of approximately $3,000,000 on Contract 34124 and the initial follow-on contract. Finding 23, n. 9.

About July 1, 1958, plaintiff's president, faced with three possible courses of action,[10] called a meeting of plaintiff's personnel concerned with the ASN-7 program to decide upon a course of action. Plaintiff's decision was to "do the research, development and engineering necessary to make it into the product that would perform as we knew it should and find some way to recover the cost of doing this, if we could find it, or take our lumps if we could not." Finding 27(a).

Accordingly, plaintiff decided to stop production until it had corrected the causes of failures, and arranged for a meeting with Air Force representatives July 7, 1958, to discuss its plan.[11] Finding 27(b). Around this same time defendant's project engineer learned for the first time of failures in the field, and he concurred in a decision to stop accepting deliveries. Finding 27(d). Thus, on July 7, 1958, the parties agreed to stop production until plaintiff had found the cures for its technical difficulties. Finding 27(d).[12] This commenced what the parties refer to as the "Interregnum". Finding 27(e).

Plaintiff's activities during the Interregnum, which continued to the end of December 1958, are set forth in the findings. Findings 28–30, 38–40. It suffices presently to say the parties are agreed (for purposes of Count I) that (a) during the Interregnum plaintiff not only performed R&D work under Contract 34124, but did so to a far greater extent than either party had anticipated in 1956, and (b) approximately 65 percent of some $4,500,000 (represented by plaintiff as a conservative compilation of all its R&D costs) reflected the cost of all R&D work performed in connection with Contract 34124 which was both actual R&D effort and of benefit to follow-on contracts. Findings 39, 40.

After the Interregnum a new delivery schedule was set up, and plaintiff exceeded delivery requirements while producing highly satisfactory sets with greater ease than before the Interregnum. Delivery of the sets called for by Contract 34124 was substantially completed about the end of 1959, although delivery of some items under that contract continued into 1961. Finding 31.

Thus, while both parties had envisioned Contract 34124, a production contract in name and in form, as involving the relatively simple repackaging of items performing a developed and proven function, serious troubles developed in the ASN-7 systems after installation in aircraft and otherwise. In order to perform its contract to the satisfaction of all concerned, plaintiff felt compelled to (and did) engage in a very substantial amount of R&D type work in order to solve the problems encountered in the use of the ASN-7 systems and to deliver systems more adequately meeting the requirements of its contracts. Findings 26, 39. Sound business reasons underlay plaintiff's decision to do so. Finding 27(c).

In the spring of 1959, at the Air Material Command, plaintiff made a presentation of its excess costs problem, with a view to obtaining from defendant some portion thereof, but no action followed. Finding 33. Around September 1959 plaintiff had printed a lengthy brochure, entitled the "AN/ASN-7 Story",

---

10. Finding 27(a) sets forth in his own words the alternatives available and the decision made. Briefly, the alternatives were to reduce costs and to continue to deliver items which "would not adequately meet the need in the aircraft", to seek a termination, or to "face the music and decide that we had produced a design or a product for the Air Force which really did not have it."

11. Plaintiff's decision was influenced by its reputation; by an awareness of competitive equipment under development; and by the possibilites of (a) future business, by way of follow-on contracts, and (b) becoming sole source, if it could produce a truly reliable product. Finding 27(c).

12. There is, however, no indication in the record that defendant then knew of, or agreed to, an extensive R & D program.

detailing its problems to that date and seeking financial consideration by the Air Force, and in November 1959 plaintiff's president made a presentation to the Commanding General, AMC, using the "AN/ASN–7 Story" as a basis. Again, no relief was forthcoming. Finding 34.

Finally, toward the middle of 1961, plaintiff's treasurer, defendant's successor contracting officer, and the latter's legal advisor explored together means whereby plaintiff might recoup some of its excess costs, but none was found. Finding 35. There followed plaintiff's unsuccessful administrative efforts to (*inter alia*) allocate R&D expenses (within ceiling price limits) under Contract 34124 to certain follow-on contracts (findings 37, 40(c)), and this action, Count I of which prays for relief not sought (or available) at the administrative level.

On these facts, plaintiff asserts that this court's holding in National Presto Indus., Inc. v. United States, *supra* (hereinafter "*Presto*"), entitles it to reformation. More precisely, plaintiff contends that there was a mutual mistake of fact; that Contract 34124 did not "allocate the risk of a mutual mistake to either the Government or the plaintiff"; [13] that plaintiff's unanticipated R&D effort resulted in a benefit to defendant; that such extra work "was of the nature the Government wished to obtain from the contract"; [14] and that, had defendant been aware of "the true facts from the beginning, [it] would have been willing to bear a substantial portion of the additional costs." [15] Defendant says, among other things, [16] that in the circumstances of this case, the risk of mistake was in any event plaintiff's, and that *Presto* is wholly inapposite. Defendant is right.

*Presto* involved a contract for the production of artillery shells by a new process. Plaintiff was to propose the equipment (and facilities) it believed would be needed for production, and defendant was to pay for the items on which agreement was reached. There was mutual agreement to dispense with certain equipment (initially proposed by plaintiff but rejected by defendant) subsequently found—but only after expenditures by plaintiff of considerable time, effort, and money—to be indispensable to satisfactory production. Under its agreement to produce 180,000 shells by the new process, at a contract price of some $980,000, the plaintiff in *Presto* had apparently lost some $750,000.[17]

In, and after, *Presto*, this court has consistently recognized that, among other things, reformation is "a remedy the purpose of which is to make a mistaken writing conform to antecedent expressions on which the parties agreed." Bromion, Inc. v. United States, 411 F.2d 1020, 1022, 188 Ct.Cl. 31, 35 (1969); see also Jamsar, Inc. v. United States, 442 F.2d 930, 935–936, 194 Ct.Cl. 819, 828–829 (1971); Macke Co. v. United States, 1328, 199 Ct.Cl. 552, 561 (1972); Evans Reamer & Machine Co. v. United States, 386 F.2d 873, 880–881, 181 Ct.Cl. 539, 551–552 (1967), cert. denied, 390 U.S. 982, 88 S.Ct. 1102, 19 L.Ed.2d 1279 (1968). The facts in *Presto* were, however, sufficiently exceptional to impel consideration of that remedy notwithstanding the absence of any mistake in the written formulation of the understanding of the parties. A definite, mutual, innocent mistake as to a very material fact, coupled with substantial loss, led *in the circumstances of that case*, to reformation.

One crucial factor contributing to that result was the conclusion that "neither the written contract nor the course of

---

13. Plaintiff's Brief, p. 34.

14. *Id.*, p. 41.

15. *Id.*, p. 41.

16. *E. g.*, defendant denies any "mutual mistake."

17. Recovery ultimately amounted to $250,-000. National Presto Indus., Inc. v. United States, 175 Ct.Cl. 881 (1966).

dealings requires that plaintiff alone bear the full consequences of the parties' mutual error as to the need for turning equipment." *Presto, supra*, 338 F.2d at 109, 167 Ct.Cl. at 764. That conclusion, in turn, rested especially (albeit not solely) on the novel and experimental character of the project, and the seriousness of the unexpected costs in relation to contract price.

The court stressed that *Presto* involved a new and joint enterprise in which neither party had any real expertise or background; that defendant was as interested in the perfection of the new process as in the end product Presto was to deliver; that the contract there was not a performance one; and that Presto was not "an expert, promising to perform and taking the whole risk and anxiety of the project off the Government's shoulders", but simply "the more active of a pair of gropers attempting to develop a new and largely untried process which was still far from mature." *Presto, supra*, 338 F.2d at 109, 167 Ct. Cl. at 764–765. *Cf.* Natus Corp. v. United States, 371 F.2d 450, 459, 178 Ct.Cl. 1, 15 (1967) (concurring opinion).

This case does not fit within that mold.

Plaintiff was, and is, experienced both as a manufacturer of navigational computer systems and as a goverment contractor. The contract specifications were, in essence, performance specifications.[18] Not only was defendant's initial draft of those specifications based on data and general layouts supplied to it by plaintiff, but the revised, final, version of the specifications resulted from plaintiff's extensive comments on the initial draft.[19] That version came some months after plaintiff had represented that open manufacturing capacity existed and that its proposal, if accepted, would result in a production supply contract, and the contract which did result was, in name and in form, just that.[20]

No novel and experimental project, nor joint enterprise, was contemplated; defendant did not really care how plaintiff went about fulfilling its promises to perform. The parties were not "gropers", knowingly engaged in a combined journey through unexplored areas, but a seller of a developed and proven (if to be repackaged) design, and a purchaser who wanted the end product plaintiff said it could promptly supply.

As *Presto* suggests (and plaintiff recognizes), a fixed-price contract does not normally impose on defendant any responsibility for whether or not the contract work can be done within the contract bid price. Aerojet-General Corp. v. United States, 467 F.2d 1293, 1301, 199 Ct.Cl. 422, 434 (1972); *Cf.* United States v. Wegematic Corp., 360 F.2d 674, 676–677 (2d Cir. 1966). Absent unusual circumstances a "fixed-price contractor * * * shoulders the responsibility for unexpected losses, as well as for his failure to appreciate the problems of the undertaking * * *." Macke Co. v. United States, *supra*.

While plaintiff's contract was of the fixed-price incentive, rather than of the pure fixed-price, type, it is clear that this circumstance is, for present purposes, of no real significance, nor is it of any aid to plaintiff in its argument

---

18. *Cf.* R. E. D. M. Corp. v. United States, 428 F.2d 1304, 1309–1310, 192 Ct.Cl. 891, 901–902 (1970); J. L. Simmons Co. v. United States, 412 F.2d 1360, 1362, 188 Ct.Cl. 684, 689 (1969).

19. *Cf.* Bethlehem Corp. v. United States, 462 F.2d 1400, 199 Ct.Cl. 247 (1972); Austin Co. v. United States, 314 F.2d 518, 161 Ct.Cl. 76 (1963), cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963); Olin Mathieson Chemical Corp. v. United States, 179 Ct.Cl. 368, 407–409 (1967).

20. Plaintiff did not urge during the administrative proceedings, nor does it now assert, the right to an equitable adjustment for increased costs of performance due to defective specifications, nor does it claim damages for breach of the implied warranty that, if government "specifications are followed, a satisfactory product will result." Hol-Gar Mfg. Corp. v. United States, 360 F.2d 634, 638, 175 Ct.Cl. 518, 525 (1966); see also Bethlehem Corp. v. United States, 462 F.2d 1400, 199 Ct.Cl. 247 (1972).

that Contract 34124 "did not allocate the risk of mistake to either party."[21] If, in a fixed-price incentive type contract, "the final cost exceeds the ceiling, the contractor suffers a loss." Lockheed Aircraft Corp. v. United States, 426 F. 2d 322, 323, n. 1, 192 Ct.Cl. 36, 39, n. 1 (1970). See also Nash, Risk Allocation in Government Contracts, 34 Geo. Wash.L.Rev. 693, 695 (1966).

Looking at the dealings of the parties as a whole, their contractual agreement, and the nature of the enterprise embodied therein, it is concluded that plaintiff "assumed all the uncovered risks inherent in its promised performance \* \* \*." Natus Corp. v. United States, *supra*, 371 F.2d at 458, 178 Ct.Cl. at 14; see also Olin Mathieson Chemical Corp. v. United States, 179 Ct.Cl. 368, 407–409 (1967). In light of the entire record, plaintiff's contractual agreement here too "forecloses any possibility of expense allocation along the lines of mutual mistake." Natus Corp. v. United States, *supra*; see also Tombigbee Constructors v. United States, 420 F.2d 1037, 1043, 190 Ct.Cl. 615, 626 (1970). Rather, any equitable relief therefor, by way of additional compensation to plaintiff, "should be left to legislation or administrative discretion." *Presto, supra*, 338 F.2d at 110–111, 167 Ct.Cl. at 767.[22]

Although plaintiff relies "exclusively" on *Presto*, there is a suggestion in plaintiff's Conclusion of an "oral novation" leading to recovery "on the order of *quantum meruit*."[23] This suggestion is wholly unsupported by any citation of authority, and is, as defendant contends, unsound.

Each of the parties has advanced a considerable number of other arguments. Each such argument has carefully been considered, but in light of the foregoing, only one issue requires any further elaboration.

In *Presto*, the court denominated as a prerequisite to reformation a showing that defendant "would have been willing, it it had known the true facts from the beginning, to bear a substantial part of the additional expenses" Presto incurred. Plaintiff urges that the record enables it to surmount that difficult hurdle sufficiently, if not well, while defendant sharply controverts that view.

Perhaps necessarily because of the retrospective and elusive investigation thus required, the record on this issue is vague, imprecise, and unsatisfying. The 1959 statement attributed by plaintiff's president to the Commanding General, AMC (finding 34) is, even as attributed, equivocal.

■ Nor does defendant's payment, in 1960 and 1961, of a higher price for most components purchased (finding 36) justify the inference plaintiff draws thereform: that, had defendant known the "true facts" in 1956, it would nonetheless have proceeded to purchase the ASN–7 at considerably increased cost. By 1960, defendant had an investment of more than $29,000,000 in that system. Time had passed as well. Differences in quantities, factors of inflation, and other relevant factors aside, defendant's alternatives in 1960 and 1961 manifestly differed from those which would have been available to it in 1956, had it then been aware of the "true facts".

While defendant's evidence of what it would have done in 1956 with that knowledge (finding 41) also lacks force, answering the inquiry posed in *Presto* would, on this record, require sheer speculation.

For the foregoing reasons, it is concluded that plaintiff is not entitled to recover on Count I, and that its amended petition should be dismissed as to that count.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which have been

---

21. Plaintiff's Brief, p. 43.

22. This statement, entirely limited to the problems raised in Count I, expresses no view upon issues yet to be considered in Counts II and III.

23. Plaintiff's Brief, pp. 39, 55.

adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover on Count I of the amended petition, and as to that count the amended petition is dismissed.