**ATLAS CORPORATION, Kerr–McGee Chemical Corporation, Quivira Mining Company, Western Nuclear, Inc., Atlantic Richfield Company, Umetco Minerals Corporation and Union Carbide Corporation, Homestake Mining Company of California, Inc., Pathfinder Mines Corporation**

v.

**The UNITED STATES.**

Nos. 281–83C, 143–84C, 144–84C, 565–84C, 576–84C, 579–84C, 580–84C and 581–84C.

United States Claims Court.

Oct. 31, 1988.

Ramsay D. Potts, Washington, D.C., attorney of record, for plaintiff Atlas Corp. (No. 281–83C). R. Kenly Webster, Charles H. Montange, Steven P. Pitler, and Shaw, Pittman, Potts & Trowbridge, of counsel.

Theodore Voorhees, Jr., Washington, D.C., attorney of record, for plaintiff Kerr–McGee Chemical Corp. (No. 143–84C). Peter J. Nickles, Carol Fortine and Covington & Burling, of counsel.

Theodore Voorhees, Jr., Washington, D.C., attorney of record, for plaintiff Quivira Mining Co. (No. 144–84C). Peter J. Nickles, Carol Fortine and Covington & Burling, of counsel.

Harley W. Shaver, Denver, Colo., attorney of record, for plaintiff Western Nuclear, Inc. (No. 565–84C). Bruce W. Dewald and Shaver & Licht, of counsel.

Theodore Voorhees, Jr., Washington, D.C., attorney of record, for plaintiff Atlantic Richfield Co. (No. 576–84C). Peter J. Nickles, Carol Fortine and Covington & Burling, of counsel.

Peter D. Dickson, Washington, D.C., attorney of record, for plaintiff Umetco Mineral Corp. and Union Carbide Corp. (No. 579–84C). Carol L. Dudnick, Grenville Garside and Van Ness, Feldman, Sutcliffe & Curtis, of counsel.

Michael R. Comeau, Santa Fe, N.M., attorney of record, for plaintiff Homestake Mining Co. of California, Inc. (No. 580–84C). William G. Langston, Jon J. Indall

and Stephenson, Carpenter, Crout & Olmsted, of counsel.

Sunny J. Nixon, Santa Fe, N.M., attorney of record, for plaintiff Pathfinder Mines Corp. (No. 581–84C). Thomas W. Pennington and Stephenson, Carpenter, Crout & Olmsted, of counsel.

Mary Mitchelson, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Sophie C. Eilperin and Mary Ann Masterson, U.S. Dept. of Energy, Charles E. Mullins, U.S. Nuclear Regulatory Com'n, and Leonard Kreitzberg, Dept. of Agriculture, of counsel.

## OPINION

MEROW, Judge:

Plaintiffs are corporations, or successors to corporations, which participated in the contractual uranium procurement program of the then Atomic Energy Commission (AEC). This program commenced in the 1940's and ended in 1970. As a result of recent scientific understanding as to the hazards of low level radiation, waste residues of the uranium production process, known as mill tailings, must now be stabilized at considerable expense. In this litigation, plaintiffs seek to recover this expense from the United States.

In each case defendant moves, pursuant to RUSCC 12(c) and 12(h)(2), for judgment on the pleadings. It is asserted that plaintiffs failed to state a claim for relief. Each plaintiff has filed a brief in opposition to the government's motion and defendant has responded. Consolidated oral argument has been held.

As this matter comes before the court on a motion for judgment on the pleadings, the allegations in the complaints are considered to be correct. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). These allegations must, however, be examined in the relevant historical context and, to this end, in resolving the issues raised, the court may also consider certain material outside the pleadings such as official documents, matters of general public record and historical publica-

**684**

tions. *Hohri v. United States,* 586 F.Supp. 769, 773 (D.D.C.1984), *aff'd,* 847 F.2d 779 (Fed.Cir.1988). *See McNamara Construction, Ltd. v. United States,* 206 Ct.Cl. 1, 5, 509 F.2d 1166, 1168 (1975).

The AEC's contractual uranium procurement program involved in the instant claims spawned considerable prior litigation in the United States Court of Claims and the resulting reported decisions and findings of fact set forth relevant official documents and historical context. *See Gay v. United States,* 174 Ct.Cl. 420, 356 F.2d 516, *cert. denied,* 385 U.S. 898, 87 S.Ct. 202, 17 L.Ed.2d 130 (1966); *Industrial Uranium Co. v. United States,* 180 Ct.Cl. 50, 376 F.2d 868 (1967).

*Background*

Starting in the late 1940's and proceeding through the 1950's, the United States government was involved in the development of the domestic uranium processing industry. The government entered into contracts with various private companies for the production of uranium concentrate and thorium through the AEC. The AEC was succeeded by both the Nuclear Regulatory Commission (NRC) and the Department of Energy (DOE). The uranium production process produces waste residues known as mill tailings which emit a low level of radiation into the environment, mainly in the form of Radon 222, which is a radioactive gas. At most production facilities, *i.e.,* "mills," the producers have deposited the tailings in large "tailings piles" in areas near to the mills. The tailings are now recognized to pose other potential environmental hazards.

The plaintiffs in these cases were either awarded a production contract by the AEC or have acquired or merged with the original contractor and have succeeded to the interests and obligations under the original contracts and subsequent modifications. In the case of the Kerr–McGee Chemical Corporation, the plaintiff is the successor in interest to thorium nitrite production contracts, the performance of which also created mill tailings with radon emissions. No significant differences between thorium

or uranium production has been raised in this matter.

As set forth in the pleadings and described in the above-cited decisions of the Court of Claims, it is undisputed that in the 1950's the AEC conducted an aggressive uranium development program. The AEC policy is described in Findings 11, 13, 45 in *Gay v. United States,* 174 Ct.Cl. at 440–41, 468, 356 F.2d 516, which summarize the AEC's Domestic Uranium Circulars, as then published in the Federal Register, as follows:

11. Beginning in 1948, the AEC formulated its program for development of domestic sources of uranium, and its announced policy was to stimulate private industry to engage in wide-spread prospecting, exploration and development of uranium ore reserves, and, since the United States was to be the sole purchaser of uranium, to give adequate guarantees as to the price and period of purchase in order that private industry could finance and operate uranium mines and mills.

In repeated public announcements, the AEC made plain its policy to limit its direct purchase of uranium ores, and to have uranium mills privately owned and operated, with raw material procurement by the AEC to be principally in the form of uranium concentrates sold by the mills to the AEC under negotiated written contracts.

\* \* \* \* \* \*

13. The AEC considered and rejected early in the formulation of its domestic uranium program the establishment of a uniform price at which it would purchase uranium concentrate from the mills. It could not arrive at a uniform price because it was impossible to forecast operating costs and depreciation schedules for different milling operations.

Consequently, the AEC determined and announced publicly that all uranium concentrate purchases would involve individually negotiated contracts for the construction and operation of privately owned mills, with the contracts providing for purchase of the mill concentrates, the

price to be arrived at by taking into account the ore cost and the estimated milling cost, including plant amortization and profit.

\*   \*   \*   \*   \*   \*

45. The terms of all uranium concentrate or mill contracts were individually negotiated between AEC and the various private companies who owned and operated the mills. It was necessary to investigate and establish that sufficient reserves of uranium ore of adequate grade were available to sustain miling operations for an adequate period of time, that such available ores were amenable to economical metallurgical processing, that adequate design had been prepared for the mill, that the proposed mill operator had management ability and financial capacity, and that an acceptable price to the AEC could be reached. The contract price for uranium concentrate varied from contract to contract and was negotiated on the basis of consideration of such factors as the "ore cost," determined by application of the Circular 5 price schedule to both captive and custom ores, the estimated milling costs, which varied depending upon the size of the mill and the metallurgical process required for the particular ore, amortization of the cost of the mill in relation to the life of the uranium concentrate contract, and a reasonable profit to the mill owner, arrived at by consideration of capital investment and related factors.

\*   \*   \*   \*   \*   \*

Accordingly, it is not disputed in this matter that the AEC uranium purchase contracts were individually negotiated with the producers with the fixed price per pound of uranium concentrate that the AEC would pay determined, for the contract periods involved, on the basis of the ore cost, the estimated milling costs, plant amortization over the contract period and a reasonable profit.

In their submissions, the parties differ as to whether these negotiated contracts, pursuant to the AEC circulars, were "fixed-price" (as the government asserts) or "cost-plus-profit" (as plaintiffs assert). The his-torical record makes clear that the AEC's published policy was to arrive at a fixed-price per pound for the concentrate delivered, which price was, in turn, developed by obtaining or forecasting the producer's costs for the contract period plus a reasonable profit, and dividing these by the concentrate quantity covered. In this respect, both parties are partially correct in their asserted contract labels.

The purchase program involved was originally to expire in 1962, but was stretched out to 1970 while a commercial market for uranium concentrate was developed. No government purchases subsequent to 1970 are involved in this matter. With the advent of production for commercial concentrate sales, the waste residue or tailings so generated have been commingled with those resulting from production under the prior AEC contracts.

It is undisputed that none of the AEC contracts involved in this matter contains any express provision assigning responsibility for the decommissioning and decontamination of the facilities after final delivery of the concentrate, or for reclamation or cleanup activities at the site, or for stabilization and reclamation of the tailings piles.

Knowledge of the hazardous nature of low level radiation such as produced by mill tailings was beyond the state of the art during the period of time the contracts involved in these matters were negotiated and performed. It was only in the late 1970's that it became widely recognized that radon emanating from uranium and thorium mill tailings posed a long-term potential health hazard.

Because of the potential environmental and health hazards, Congress enacted the Uranium Mill Tailings Radiation Control Act (UMTRCA), Pub.L. No. 95–604, 92 Stat. 3021 (Nov. 8, 1978), *codified at* 42 U.S.C. § 7901, *et seq.* Under Title I of the Act, the federal government has responsibility for the stabilization and decommissioning of all inactive mill sites which were not licensed on January 1, 1978. *See, generally,* 42 U.S.C. §§ 7912–7919.

Title II of the UMTRCA authorizes the development of regulatory requirements for the stabilization and decommissioning of mill sites which remained active after January 1, 1978. *See, generally,* 42 U.S.C. §§ 2022, 2113. Under Title II, the licensee is responsible for complying with federal requirements regarding stabilization of the tailings piles, decontamination and decommissioning of the plants, and reclamation of the plant site and its surrounding land. *See* 42 U.S.C. § 2113.

Congress directed the Environmental Protection Agency (EPA) to establish general health and safety standards for radiological hazards associated with mill tailings (42 U.S.C. § 2022(b)(1)). The EPA has issued final standards governing actively licensed milling and disposal sites, 40 C.F.R. § 192 (1983), and the NRC has issued regulations incorporating the EPA guidelines (10 C.F.R. §§ 40 and 150 (1985)). These matters are discussed in detail in *American Min. Congress v. Thomas,* 772 F.2d 617 (10th Cir.1985), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2275–76, 90 L.Ed.2d 718 (1986) (petition for review of EPA standards for the cleanup and disposal of uranium mill tailings originating from designated inactive mill sites) and *American Min. Congress v. Thomas,* 772 F.2d 640 (10th Cir.1985), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 718 (1986) (challenge to EPA standards for active mill tailings sites).

Many facilities covered by Title II do not contain tailings related to the old AEC contracts. However, the plaintiffs in the instant cases held licenses on January 1, 1978 for active facilities which did contain tailings relating to the government contracts, which are now commingled with tailings produced under subsequent commercial nuclear contracts. As such, plaintiffs assert they have expended and will expend considerable sums in connection with obviating the hazards associated with the tailings generated from uranium concentrate sales to the AEC. Recovery of these costs is sought.

### Discussion

The main theory on which plaintiffs seek to recover the cost of eliminating the environmental hazards associated with their mill tailings is reformation of the AEC uranium purchase contracts on the basis of an asserted mutual mistake of fact. Plaintiffs claim that both parties to the AEC uranium purchase contracts were mistaken as to the hazardous nature of mill tailings and, had this hazard been then known, the costs now required to ameliorate the situation would have been incorporated, in some way, in the transactions.

The parties have devoted substantial argument to the theory of contract reformation in general, but it is concluded that the matter must be resolved by reference to the nature of the contractual jurisdiction this court can exercise pursuant to 28 U.S. C. § 1491.

As has been held numerous times with respect to claims based upon contracts implied by law, 28 U.S.C. § 1491 does not confer jurisdiction in a situation where, between private parties, an agreement can be imposed; rather, jurisdiction to render a judgment against the United States is conferred only where the government has agreed to be bound. *Aetna Casualty and Surety Co. v. United States,* 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059 (1981). Either an express or an implied-in-fact contract is required. *See W.R. Cooper General Contractor, Inc. v. United States,* 843 F.2d 1362 (Fed.Cir.1988). Similarly, for reformation to form the predicate for a money judgment under 28 U.S.C. § 1491, there must be a prior agreement by the government as to the provisions involved which can be so given effect. The Claims Court has no authority to write contracts, or contract clauses, for the United States by means of reformation. *American President Lines, Ltd. v. United States,* 821 F.2d 1571, 1582 (Fed.Cir.1987).

In the circumstances presented with respect to the uranium purchase contracts, it is undisputed that there exists no agreement between the parties with respect to the now required elimination of mill tailings hazards. There was no mutual mis-

take, as the existence of the hazard was not knowable at the time of the negotiations. Because it was not possible for the hazard to have been known to the parties when contracting, no agreement could have been made on this matter which can now be placed into effect by means of reformation. The consensual nature of the contract jurisdiction conferred by 28 U.S.C. § 1491 requires that the agreement be limited to what was actually negotiated on the basis of the circumstances then known to the negotiators. Even if it could now be ascertained what the negotiators would have agreed to, had future events been known, this would not constitute the contract actually negotiated. In interpretation issues, "the language of a contract must be afforded the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances." *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). *See Alvin, Ltd. v. U.S. Postal Service*, 816 F.2d 1562, 1565 (Fed. Cir.1987); *City of Oxnard v. United States*, 851 F.2d 344, 347 (Fed.Cir.1988); *Deloro Smelting and Refining Co. v. United States*, 161 Ct.Cl. 489, 497, 317 F.2d 382, 387 (1963).[1]

The "contemporary circumstances" involved with respect to the uranium purchase contracts precluded any actual agreement with respect to adding costs to obviate a hazard whose existence was not then known or knowable. Only those costs (incurred or estimated) which were then knowable and subject to actual negotiation

formed the basis for the fixed prices the AEC agreed to pay, per pound of uranium concentrate delivered, as was explained in the published AEC policy set out, *supra*.[2]

In *Bowen–McLaughlin–York Co. v. United States*, 813 F.2d 1221 (Fed.Cir. 1987), incurred costs were mistakenly omitted in determining a fixed price and reformation was granted. In the instant matter, plaintiffs cannot plead that any then knowable relevant cost was mistakenly omitted from negotiations for the fixed uranium concentrate prices AEC paid, and no valid basis for reformation has been shown.

Plaintiffs argue, however, that reformation is supported by *National Presto Industries, Inc. v. United States*, 167 Ct.Cl. 749, 338 F.2d 99 (1964), *cert. denied*, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965). However, in the unique facts of that case, the mutual mistake on which recovery was premised involved the need for certain turning equipment which was in existence, had been the subject of actual negotiations, and was knowable such that a consensual agreement supporting reformation under 28 U.S.C. § 1491 was an available remedy. That is not the case here.

Accordingly, it is concluded that, upon the facts pleaded as considered in their context, plaintiffs can in no way establish a claim for reformation of their AEC uranium purchase contracts to add provisions providing compensation for the subsequent costs involved in removing the hazards of mill tailings.[3]

---

1. Similarly, the standard for holding a party responsible for contract damages is premised upon foreseeability at the time of contracting. *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 877, 524 F.2d 707, 714 (1975), *cert. denied*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976). A hazard that was not knowable to the parties when contracting could not be foreseeable. No reason exists to depart from this general contracting principle when considering reformation. The agreement actually reached in the contemporaneous circumstances is controlling. *See also Glopak Corp. v. United States*, 851 F.2d 334 (Fed.Cir.1988) (unconscionability must be determined at the time the contract was entered into); *Brubrad Co. v. U.S. Postal Service*, 404 F.Supp. 691 (E.D.N.Y.1975), *aff'd*, 538 F.2d 308 (2d Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 99,

50 L.Ed.2d 99 (1976) (reformation on the basis of subsequent events denied).

2. An agreement to pay any cost forever into the future would not have been sanctioned by the published AEC policy which was premised upon determining a fixed price for concentrate delivered during the contract period. Moreover, any such agreement would raise substantial authority questions. *See California–Pacific Utilities Co. v. United States*, 194 Ct.Cl. 703 (1971).

3. Moreover, to add provisions to reflect an agreement to pay the costs now known to be required to eliminate the mill tailings hazards would not have been a simple undertaking. The AEC's published contracting policy was to negotiate a fixed price to be paid per pound of

■ Plaintiffs, with the exception of Atlas Corporation, also argue that the costs of eliminating the tailings hazards may be recovered on a breach of contract theory. This approach necessarily assumes that removal of the subsequently discovered tailings hazards is a part of the uranium purchase contracts. As it has been concluded that no such agreement could have been negotiated, so that reformation is not possible, it follows that plaintiffs have no breach of contract claims to assert. They have been paid the negotiated prices for the uranium concentrate delivered and the contracts, absent adding cleanup and reclamation provisions regarding mill tailings by reformation, call for no additional monetary relief.[4]

■ Western Nuclear also argues for recovery on an implied-in-fact contract theory, but this cannot constitute a viable approach in the absence of an agreement such as would support reformation. The AEC uranium procurement program, as set out in the published materials, was limited to contracts for uranium concentrate at a negotiated price over a defined contract period. There is no sanction for any separate implied-in-fact tailings hazard contract unrelated to the negotiated uranium purchase agreements. *See ITT Federal Support Services, Inc. v. United States,* 209 Ct.Cl. 157, 168 n. 12, 531 F.2d 522, 528 n. 12 (1976).

Western Nuclear also asserts that it has at all times acted as an agent for the government in its uranium dealings so that it does not own mill tailings. However, assuming this allegation to be correct, Western Nuclear does not show how this circumstance would produce a claim for monetary relief within the jurisdiction afforded by 28 U.S.C. § 1491. Perhaps the allegation is intended to reflect a position in defense of any enforcement action under UMTRCA.

■ Western Nuclear asserts in its complaint that compliance with the UMTRCA and regulatory requirements will cause it to spend more money "upon termination of its license without renewal" than the mill itself is worth. This circumstance is claimed to amount to a taking of its property, entitling it to just compensation under the Fifth Amendment to the Constitution.

It is concluded that Western Nuclear cannot set forth a valid "taking" claim in the circumstances pleaded. There is no physical invasion of the property. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435–38, 102 S.Ct. 3164, 3175–78, 73 L.Ed.2d 868 (1982). Western Nuclear does not claim that, pursuant to the law and regulations, the government has physically interfered with its commer-

---

uranium concentrate delivered. If the need for subsequent environmental cleanup costs had been knowable and if the parties had determined that they would be negotiated, the question would have arisen as whether to include the cost as a part of the price paid for each pound of uranium concentrate, or whether a separate provision was required. Usually, advance payments are not made. *See* 31 U.S.C. § 3324. While the AEC undoubtedly had broad authority to contract for uranium concentrate, the published parameters for the program did not indicate that payments, other than for delivered concentrate, were contemplated. If the costs were incorporated as a part of the fixed price paid for delivered uranium, any agreement would, presumably, have had to provide assurances that some portion of the price paid by AEC would be segregated and set aside for this subsequent environmental cleanup obligation. Perhaps a reserve fund would be required, calling for investment decisions. Some consideration as to the possibility that a successor corporation(s) would become involved would be needed. Plaintiffs have, however, set forth no such "antecedent expressions on which the parties agreed." *Sperry Rand Corp. v. United States,* 201 Ct.Cl. 169, 179, 475 F.2d 1168, 1174 (1973).

4. On the pleaded facts, no AEC (or successor agency) contracting officer has, under the authority of the uranium purchase contracts involved, issued any order(s) requiring removal of the subsequently recognized tailings hazards. The obligation to undertake this activity arises from the provisions of the UMTRCA. Given the apparent extent of the tailings undertakings plaintiffs indicate are now required by UMTRCA or otherwise, even if the AEC uranium purchase contracts were considered to remain viable for purposes of amendment (reformation), this might well not be possible. Any amendment(s) of such a magnitude could well be beyond the scope of the original contracts as negotiated. *Edward R. Marden Corp. v. United States,* 194 Ct.Cl. 799, 442 F.2d 364 (1971).

cial production of uranium or that such production has been or now is commercially unprofitable in and of itself because of government regulation, as opposed to being difficult and expensive to clean up after and to cease operations. Thus, the plaintiff has not alleged that it has been deprived of all beneficial use of its property. *See, e.g., Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982).

In this case, mill tailings from the AEC contract deliveries are now commingled with commercial tailings, all of which must be cleaned up and the mill made safe after operation ceases. However, such requirements in and of themselves do not give rise to a compensable taking even though the costs thereof are quite high. *See, e.g., Allied–General Nuclear Services v. United States,* 839 F.2d 1572, 1576 (Fed.Cir. 1988); *Galloway Farms, Inc. v. United States,* 834 F.2d 998, 1002 (Fed.Cir.1987); *Carruth v. United States,* 224 Ct.Cl. 422 and 446, 627 F.2d 1068 (1980); *Radioptics, Inc. v. United States,* 223 Ct.Cl. 594 at 620, 621 F.2d 1113 (1980). That is, the government may regulate the use of land or a business through its police powers, *i.e.,* for health and safety reasons, even if such regulation causes the owners of such property to spend additional revenue, without such regulation being found a constitutional taking requiring compensation. Individuals hold their property subject to the limitation that they not use it in dangerous or noxious ways. *Keystone Bituminous Coal Assn. v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *Matter of Quanta Resources Corp.,* 739 F.2d 912 (3rd Cir.1984), *aff'd, Midlantic National Bank v. N.J. Dept. of E.P.,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

In this case, Western Nuclear alleges the mill and its production value are diminished and are less than the plaintiff's past and future costs of complying with the regulatory requirements. However, these allegations do not surmount those made in other cases before the Supreme Court which were not sustained as Fifth Amendment takings.[5] For example, in *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), the statute which mandated the destruction of red cedar trees without compensation for their value in order to protect apple orchards was held not to constitute a taking. In *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), the enactment of a zoning ordinance limiting the uses of unimproved property which reduced the property's value by 75 percent was not found to constitute a taking. In *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), an ordinance precluding the manufacture of brick did not constitute a taking even though it reduced the value of the petitioner's land to less than one-tenth its prior value.

In addition, if a taking were to be found under these circumstances, many regulations the government implements to protect the environment and/or the health and safety of its citizens would result in compensation to those who are responsible for the "noxious" or "nuisance-type" uses as they could claim a taking based on their costs of compliance. For instance, the Clean Air Act, 42 U.S.C. § 7401, *et seq.,* provides for national standards on the level of air pollutants. The act provides penalties for noncompliance. 42 U.S.C. § 7413. Under Western Nuclear's theory, those required to comply with the Clean Air Act standards would have to be compensated for a constitutional taking because the costs of compliance may be high.[6]

---

5. *See* Michelman, "Property, Utility, And Fairness: Comments on the Ethical Foundations of 'Just Compensation' Law," 80 Harv.L.Rev. 1165, 1191 (1967), in which the author comments on "the absence of 'magnitude' considerations from decisions sustaining curbs on 'noxious' or 'nuisance-like' uses of property; for these may, it seems, be quelled by public authority without any compensation for huge losses representing

near-total devaluation of holdings." (Footnote omitted.)

6. *See Union Electric Co. v. EPA,* 427 U.S. 246, 256, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976), wherein the court stated that "[a]fter surveying the relevant provisions of the Clean Air Act Amendments of 1970 and their legislative history, we agree that Congress intended claims of economic and technological infeasibility to be

Therefore, for the above-stated reasons and because the requirements imposed by the UMTRCA and the implementing regulations cannot be more technologically or financially onerous than those imposed by other environmental protection measures such as the Clean Air Act, no taking claim has been set forth requiring further proceedings for its resolution.

■ Western Nuclear also claims that the UMTRCA violates the equal protection clause of the Fifth Amendment because licensees of active sites must pay for reclamation and decommissioning while the government pays those costs for inactive mill sites. However, pursuant to section 115 of the UMTRCA, the Department of Justice has the responsibility of reporting to Congress on whether it would be possible to obtain reimbursement for the government funds expended pursuant to the act from former owners of the inactive mill sites. *See* 42 U.S.C. § 7925 (1978). Thus, rather than expressing an intent to pay the entire bill for all mill sites, it is clear that Congress desired that those who operated the mills pay the costs of cleanup.

The tenor of the argument submitted indicates that plaintiff's concern is not so much that equal treatment is provided under the law as that the government reimburse past costs and pay future expenses of complying with the regulations. However, this type of challenge to the act and the regulations does not constitute a claim for a money judgment against the government that would be within the jurisdiction of this court. *See Carruth v. United States*, 224 Ct.Cl. 422, 445, 627 F.2d 1068 (1980), in which the court stated:

wholly foreign to the Administration's consideration of a state implementation plan." In addition, Justice Powell in his concurring opinion at 270, n. 1, states: "The record is clear beyond question that at least the sponsors and floor leaders of the Clean Air Act intended that industries unable to comply with approved state implementation plans, whether because of economic or technological infeasibility, would be 'closed down.' * * * Indeed * * * it is clear from the legislative history that even total technological infeasibility is 'irrelevant.'" *See also Lead Industries Ass'n v. Environmental Protection Agency*, 647 F.2d 1130 (D.C.Cir.1980), *cert.*

This court has no jurisdiction over claims based upon the Due Process and Equal Protection guarantees of the Fifth Amendment, because these constitutional provisions do not obligate the Federal Government to pay money damages. *Walton v. United States*, 213 Ct.Cl. 755 (1977); *Muehlen v. United States*, 209 Ct.Cl. 690 (1976); *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967).

In *Carruth* the plaintiff made a similar equal protection argument. In that case, farmers and shellers received different treatment pursuant to a federal regulation providing for indemnification for shellers with no comparable provision for farmers with respect to peanuts which could not be sold. The court rejected that claim because there was no obligation under the asserted regulation for the government to pay money damages. Thus, Western Nuclear's assertion does not state a claim for relief as the statute involved, UMTRCA, does not provide compensation. A general claim based solely on the equal protection clause must fail since this court would not, under any set of facts, be able to order monetary relief.

■ Finally, Western Nuclear claims that the UMTRCA constitutes an *ex post facto* law which requires it to reclaim the mill tailings and decommission its mill, all of which were created prior to passage of the act, because its license was in effect on January 1, 1978, which was 10 months prior to the act's passage. Thus, plaintiff was not allowed to cease operation and escape the consequences of the act prior to its effective date. The government argues that this type of claim is not for a money

*denied*, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980), in which the court, upon consideration of the Clean Air Act and its legislative history, stated at 1150, "[I]f there is a problem with the economic or technological feasibility of the lead standards * * * [the] party affected by the standards, must take its case to Congress, the only institution with the authority to remedy the problem. [Footnote omitted.] Thus, it is clear that Congress may enact statutes directing industry compliance which is not feasible either economically or technologically and such legislation may be upheld."

judgment against the government and, consequently, does not come within the jurisdiction of this court pursuant to 28 U.S.C. § 1491.

Based on the allegations in Western Nuclear's complaint and its brief, this claim is not within the jurisdiction of the Claims Court. As the court stated in *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967):

Section 1491 of Title 28 of the United States Code allows the Court of Claims to entertain claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States * * *". But it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here. The claim must, of course, be for money. Within that sphere, the noncontractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury. [Footnote omitted.]

Plaintiff is not basing this particular claim on a contract theory or on the theory that it is seeking the return of money previously paid to the government.[7] Plaintiff may have spent money to clean up its mill tailings, but such money has not been alleged to have been paid to the government. Thus, its claim must be that some law, regulation or the Constitution grants it the right to be paid a certain sum. As to this type of claim, the court stated in *Eastport Steamship Corp.,* 178 Ct.Cl. at 607, 372 F.2d at 1008–09:

Where the claimant is not suing for money improperly exacted or retained (the first class defined above), the historical boundaries of our competence have excluded those instances in which the basis of the federal claim—be it the Constitution, a statute, or a regulation—cannot be held to command, in itself and as correctly interpreted, the payment of money to the claimant, but in which some other principle of damages has to be invoked for recovery. * * *

Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained. If not, this court cannot give relief under Section 1491 * * *.

Here, it is clear that the UMTRCA and the regulations do not mandate compensation by the government for plaintiff's compliance costs. Rather, the statute itself mandates just the opposite, *i.e.,* that the plaintiff and not the government pay for the remedial actions required of the active mill licensees. *See* 42 U.S.C. §§ 2113 and 7925. In addition, there is no language in the *ex post facto* clause itself which requires the payment of money damages for its violation.[8] U.S. Const. Art. I, § 9, cl. 3. *See generally Murray v. United States,* 817 F.2d 1580 (Fed.Cir.1987), in which the court found that the Claims Court did not have jurisdiction over the appellants' claim that they were deprived of their property without due process of the law because the Fifth Amendment's due process clause con-

---

7. Plaintiff does not claim that it has had to pay a civil penalty because of noncompliance and that it is suing for the return of its money which was illegally extracted. In fact, plaintiff has not paid any penalties and states it wants to avoid having to pay them by complying with the remedial requirements (at the government's expense).

8. In addition, as the court stated in *Korte v. Office of Personnel Management,* 797 F.2d 967,

972 (Fed.Cir.1986), "from 'earliest times,' the Supreme Court has construed the *ex post facto* provision to apply only to criminal laws." (Citation omitted). Thus, since the penalties imposed pursuant to the UMTRCA are civil, not criminal, the express constitutional proscription against *ex post facto* laws would not be relevant. *See* section 110 of the UMTRCA of 1978, 42 U.S.C. § 7920; *United States v. D.K.G. Appaloosa, Inc.,* 829 F.2d 532, 540–45 (5th Cir.1987).

tained no language requiring damages for its violation.

Thus, no relief may be granted Western Nuclear by this court since the assertion that the plaintiff is owed compensation because the UMTRCA is claimed to constitute an *ex post facto* law does not present a claim within the court's jurisdiction.

Western Nuclear requests that any of its constitutional claims, determined to be outside the jurisdiction of the Claims Court, be transferred to the United States District Court for the District of Colorado. It does not appear that constitutional challenges to the enforcement of environmental cleanup statutes on equal protection or retroactivity theories have met with success. *See United States v. Union Gas Co.*, 832 F.2d 1343, 1357 (3rd Cir.1987); *United States v. Northeastern Pharmaceutical*, 810 F.2d 726 (8th Cir.1986); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162 (D.C.Mo.1985). *See also Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 18–19, 96 S.Ct. 2882, 2893–94, 49 L.Ed.2d 752 (1976). However, this does not militate against presentation of these matters by Western Nuclear before a court having jurisdiction to resolve them with the benefit of the filing date in this matter as provided in 28 U.S.C. § 1631. *TVA v. United States*, 13 Cl.Ct. 692, 696 (1987).

### Conclusion

As it has been determined that plaintiffs are entitled to no relief under any state of facts which could be proved on the pleaded allegations as viewed in the historical context of the AEC's uranium procurement program, it is ORDERED that final judgments shall be entered as follows:

(1) The complaints in these matters, except No. 565–84C, shall be dismissed with no costs to be assessed;

(2) All claims in No. 565–84C, with the exception of the constitutional equal protection and *ex post facto* claims, shall be dismissed with no costs assessed;

(3) No. 565–84C shall be transferred, pursuant to 28 U.S.C. § 1631, to the United States District Court for Colorado for appropriate action with respect to the remaining constitutional equal protection and *ex post facto* claims.