DA 11-0769

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 5

TOTAL INDUSTRIAL PLANT SERVICES,
INC., an Oklahoma corporation,

        Plaintiff, Appellant, and Cross-Appellee,

    v.

TURNER INDUSTRIES GROUP, LLC.,
a Louisiana limited liability company;
CHS, INC., a Minnesota corporation;
and FIDELITY AND DEPOSIT COMPANY
OF MARYLAND, a Maryland corporation,

        Defendants and Appellees, and Cross-Appellants.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                 In and For the County of Yellowstone, Cause No. DV 09-1688
                 Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Jon E. Doak, Doak & Associates, P.C., Billings, Montana

                Norman A. Abood, Attorney at Law, Toledo, Ohio

        For Appellee:

                Alan L. Joscelyn; KD Feeback; Gough, Shanahan, Johnson
                &Waterman, PLLP, Helena, Montana

                      Submitted on Briefs:  October 10, 2012
                               Decided:  January 15, 2013

Filed:

                  _____
                               Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     Total Industrial Plant Services, Inc. ("TIPS"), appeals the District Court's entry of judgment in favor of defendants Turner Industries Group, LLC ("Turner"), and Fidelity and Deposit Company of Maryland ("Fidelity"), dismissing TIPS's claims for additional compensation under either *quantum meruit* or breach of contract, awarding fees and costs to Turner, and finding TIPS's construction lien time barred by operation of § 71-3-535, MCA. Turner cross-appeals, arguing the District Court erred both by granting TIPS partial summary judgment on the return of retainage and by dismissing Turner's bill of costs as being untimely filed.

## ISSUES

¶2     We restate the issues on appeal as follows:

¶3     1. Did the District Court err by denying TIPS's claim for additional compensation under a theory of either *quantum meruit* or breach of contract?

¶4     2. Did the District Court err by failing to find that TIPS was the prevailing party and awarding costs and fees to Turner?

¶5     3. Did the District Court err by finding TIPS's construction lien was barred by the 90-day statute of limitations found in § 71-3-535, MCA?

¶6     4. Did the District Court err by granting partial summary judgment to TIPS and ordering Turner to return the retainage?

¶7     5. Did the District Court err by dismissing Turner's bill of costs for being untimely filed pursuant to § 25-10-501, MCA?

## FACTUAL AND PROCEDURAL BACKGROUND

2

¶8     This appeal stems from a construction contract dispute between TIPS, an Oklahoma corporation, and Turner, a limited liability company formed in Louisiana. Fidelity and Deposit Company of Maryland ("Fidelity") is the surety for Turner's substitution bond filed in November of 2008 in lieu of TIPS's construction lien.

¶9     Turner entered into a written subcontract with TIPS to install insulation at a "coker" unit at a refinery in Laurel, Montana, on April 14, 2007. Turner also entered into two other subcontracts with TIPS for fireproofing and painting the coker, neither of which is at issue. Cenex Harvest States ("CHS") owns the refinery and hired Turner to act as the general contractor on the coker project. The initial subcontract between Turner and TIPS was to be paid as a fixed price totaling $2,336,967.00, with payment rendered by percentage of completion. The subcontract further provided that TIPS was responsible for the costs of all labor, services, and materials.

¶10    The original subcontract contemplated a start date in May of 2007 and a completion date of December 31, 2007. While TIPS began work fireproofing structural steel in May, Turner did not release TIPS to start insulating until October of 2007. It soon became apparent that TIPS would not meet the completion date. Both sides acknowledge that this was due to delays in the work of other subcontractors, a harsh winter, a change in insulation material, and an inability to obtain pipe and cable following Hurricane Katrina. Specifically, TIPS testified at trial that the cold weather reduced productivity because workers would periodically take breaks to warm in tents, and Turner also requested that TIPS not insulate welds on the piping to accommodate hydrostatic pressure testing that had run behind schedule. TIPS could thereafter only insulate straight-run piping in the first pass and had to

3

leave the welded sections of pipe without insulation, returning to finish the job once the welds were tested. In response to the increasing delays, Turner repeatedly requested that TIPS increase the number of workers on the job.

¶11 The subcontract did address how the parties were to deal with delays, changes to the scope of work, jobsite conditions, and the costs of "manning up." The recitals provided that "SUBCONTRACTOR shall furnish and pay for all labor, services and/or materials and perform all the work necessary or incidentally required for the completion of" the project. Section 7.2 directed that TIPS was to supply "a sufficient number of properly qualified workers" to perform the work "efficiently and promptly." Section 11.2 stated that TIPS was to "take all measures necessary to eliminate . . . delays," including hiring extra personnel, "at no cost" to Turner or CHS. Section 10 allowed Turner to make alterations to the scope of work and required TIPS to submit written change orders to cover any additional costs or time extensions that resulted. Moreover, Section 3 required TIPS to assume responsibility for unanticipated costs stemming from the location of the project and general and local conditions.

¶12 Despite these provisions, TIPS claimed that Turner's requested changes resulted in inefficiencies and extra costs not covered by the original fixed price subcontract and not paid for after the switch to time and materials. As noted, Section 10 specifically addressed how the parties were to handle Turner's requested changes to the project, and required TIPS to submit written change orders describing the nature and cost of the extra work. TIPS did submit a number of change orders following some of Turner's requests, and uncontested testimony at trial established that Turner paid every change order that TIPS submitted.

4

Indeed, the parties had agreed that TIPS would have to submit a change order to cover the additional costs stemming from leaving welds without insulation. Whether TIPS submitted written change orders to cover the requested changes and increased costs was contested, however, and TIPS has instead argued that Turner made oral promises of compensation that obviated the need for written change orders.

¶13 Turner and TIPS also agreed to several increases in the compensation paid to TIPS, eventually revising the subcontract five times to increase TIPS's pay. On January 4, 2008, Turner and TIPS agreed to a revised fixed price payment of $4,224,278.96, an increase of $1,887,311.96 over the original subcontract. This increase consisted of $38,300.00 for extra insulation, $1,460,756.00 for work approved over the original bid amount, $36,078.76 in additional equipment, and $352,177.20 for mineral wool.

¶14 TIPS and Turner subsequently began discussing changing from fixed price payment to "time and materials" invoicing in January of 2008. TIPS sought the change to realize direct compensation for the additional manpower and work it claims Turner was requesting. CHS and Turner agreed to the change on February 6, 2008, retroactive to February 4, 2008, believing that it would incentivize TIPS to increase manpower and allow Turner to exact more control over the project. Turner also believed the change would eliminate issues concerning unknown extra costs, remove the need for future payment negotiations, and potentially preclude a claim by TIPS over compensation.

¶15 TIPS began to submit invoices based on time and materials costs on February 4, 2008. At that time, Turner calculated that TIPS had completed 47% of the insulation project under the fixed price subcontract. TIPS contested this calculation and payment, and also argued

that it has not been compensated for losses it suffered from inefficiencies that resulted from Turner's requests.

¶16    Thereafter, on March 10, 2008, a second revision increased payment to TIPS to $7,000,000.00. This increase included payment of $94,685.00 for hydraulic power manifolds, $148,500.00 in filtration system materials, $347,051.90 in extra work, and $2,185,484.14 in estimated future time and materials work. This revision also incorporated a $4.00 per hour increase in the labor rate agreed to on February 13, 2008, bringing the hourly rate to $43.45. This was apparently done at TIPS's request to enable them to attract more qualified insulators.

¶17    A third revision increased TIPS's payment to $10,000,000 on April 17, 2008. This increase was based on an invoice TIPS submitted for additional work. A fourth revision on June 6, 2008, increased TIPS's pay to $13,000,000.00, and was similarly based on a TIPS invoice for work under time and materials. A final, fifth, revision on July 25, 2008, increased TIPS's payment to $13,250,000.00. It is uncontested that TIPS was paid the final revised amount, and all time and materials claims from February 4, 2008, onward have been paid.

¶18    TIPS began to claim additional compensation was owed in the spring of 2008 despite these modifications. In particular, Turner refused to pay TIPS's invoice 1895-1, which claimed a payment of $700,095.00 for "inefficiencies," and Turner thereafter left the work site on June 25, 2008. TIPS remained at CHS through July, and while the end date of TIPS's work under contract was in dispute, the parties do not dispute that TIPS completed its work under the subcontract. TIPS thereafter filed a construction lien against the CHS refinery on

6

September 24, 2008, alleging Turner owed TIPS $1,283,704.08. Turner then filed a substitution bond for 1.5 times the lien.

¶19 TIPS filed its complaint on December 3, 2009, alleging theories of breach of contract, *quantum meruit* and unjust enrichment, breach of the covenant of good faith and fair dealing, and seeking foreclosure of the lien. The complaint sought $1,283,704.08.

¶20 Prior to trial, the parties filed cross-motions for summary judgment. The court granted TIPS's motion for partial summary judgment, ordering Turner to return the $374,225.82 in retainage it had withheld. The court also denied Turner's motion alleging that TIPS's lien was void and requesting the court dismiss the complaint, arguing venue in Montana was not proper and the court lacked subject matter jurisdiction.

¶21 A bench trial was held on July 11, 12, and 29, 2011. At trial, TIPS sought additional compensation for what it claimed was uncompensated additional work Turner requested under the fixed price contract, payment owed under the fixed price agreement for percentage completed, and unpaid time and materials work between January 1, 2008, and February 4, 2008. Turner presented testimony that TIPS was paid $13,250,000.00, argued that TIPS bore responsibility for extra costs under the fixed price contract, and presented evidence that TIPS had not submitted written change orders as required for the additional compensation it sought. The District Court entered its Findings of Fact and Conclusions of Law on November 22, 2011, and found for Turner on each allegation in TIPS's complaint.

## STANDARD OF REVIEW

¶22 "We review the findings of a trial court sitting without a jury to determine if the findings are clearly erroneous. Rule 52(a), M. R. Civ. P," and we review the court's

conclusions of law for correctness. *Lewistown Miller Constr. Co. v. Martin*, 2011 MT 325, ¶¶ 15, 17, 363 Mont. 208, 271 P.3d 48. A district court's construction and interpretation of a contract is a question of law that is also reviewed for correctness. *Richards v. JTL Group, Inc.*, 2009 MT 173, ¶ 14, 350 Mont. 516, 212 P.3d 264. An order concerning attorney fees is reviewed for an abuse of discretion. *B Bar J Ranch, LLC v. Carlisle Wide Plank Floors, Inc.*, 2012 MT 246, ¶ 10, 366 Mont. 506, 288 P.3d 288. This Court reviews a decision on summary judgment de novo. *Dick Anderson Constr., Inc. v. Monroe Prop. Co.*, 2011 MT 138, ¶ 16, 361 Mont. 30, 255 P.3d 1257.

## **DISCUSSION**

¶23 *1. Did the District Court err by denying TIPS's claim for additional compensation under a theory of either* quantum meruit *or breach of contract?*

¶24 TIPS alleges on appeal that the District Court erred by not finding that it was owed additional compensation under either a theory of breach of contract or *quantum meruit* and unjust enrichment. TIPS's claim specifically involves three sources of allegedly owed compensation. First, TIPS disputes that it was adequately paid for the 47% of the project Turner calculated it had completed at the time of the switch to time and materials invoicing on February 4, 2008. Second, TIPS asserts that cold weather and changes in the scope of work increased costs, which TIPS contends Turner orally promised to pay for. Last, TIPS argues that it is owed for additional man hours provided in January of 2008. As a result, TIPS alleges that it is still owed $2,102,878.25 above the $13,250,00.00 it acknowledges receiving. In response, Turner argues that TIPS did not submit the required written change

8

orders for the payments it is requesting, and that pre-February 4, 2008 labor costs were TIPS's responsibility.

¶25 At the outset, we find that the District Court properly concluded that because all of the work completed by TIPS was done pursuant to an express contract, there was no basis for TIPS's claims under the theory of *quantum meruit* or unjust enrichment. Theories of quasi-contractual obligations are premised on the absence of an express contract, and as such, do not apply here. *See Estate of Pruyn v. Axmen Propane, Inc.*, 2009 MT 448, ¶ 63, 354 Mont. 208, 223 P.3d 845. We accordingly affirm the court's dismissal of TIPS's *quantum meruit* and unjust enrichment claims.

¶26 The District Court also determined that TIPS's contract-based claims were "directly refuted by the plain language of the Subcontract." The court based this conclusion on findings that the subcontract required written modifications, placed responsibility for site conditions on TIPS, allowed Turner to change the scope of work, and provided that written change orders were the exclusive mechanism by which TIPS could seek extra compensation in response to these changes. As noted above, we review the court's findings of fact for clear error, *Lewistown Miller Constr. Co.* ¶¶ 15, 17, and its legal conclusions for correctness. *Richards,* ¶ 14.

¶27   a.  TIPS's Claimed Percent of Completion Payment

¶28 TIPS claims that Turner did not fully compensate it for the 47% of piping TIPS insulated prior to February 4, 2008, asserting that Turner's payments for "materials" could not be applied to sums owing for labor. Essentially, TIPS contests the characterization of fixed price payments as applying generally towards one "bucket" of owed money, and claims

that invoices paid for rentals, vehicles, or storage cannot count towards money owed for labor. Turner counters that payments made under fixed price invoicing are essentially fungible and are applied towards the total contract price.

¶29 The District Court rejected TIPS's argument, finding that the evidence established that funds paid under the fixed price subcontract, whether labeled as for materials or labor, were interchangeable and applied to the total owed under the contract. On appeal, TIPS has not presented any authority, legal or otherwise, in support of their argument. While we recognize that the appellant, rather than this Court, is obligated to conduct legal research or develop legal analysis supporting their position, M. R. App. P. 12(1)(f), it is clear that the original fixed price subcontract contemplated a total payment of $2,336,967.00 to TIPS, all costs included. Indeed, under fixed price contracts generally, "[t]he [sub]contractor receives *one fixed price* for performing the work no matter how costly it is to perform," and periodic payments "are typically based upon the percentage of the project completed." Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* vol. 2, § 6:71, 621-22, (West 2002) (emphasis added). Because fixed price contracts consist of essentially indistinguishable periodic payments applied towards a set price, it is clear that TIPS places undue significance on the labels affixed to various payments. In light of the nature of fixed price contracts generally and, more specifically, the subcontract at issue, the court correctly concluded that payments made under the fixed price subcontract were functionally indistinguishable, and we affirm the District Court's dismissal of TIPS's claim for owed completion pay.

¶30    b. TIPS's Claimed Inefficiency and Change in Scope Costs

10

¶31 TIPS also claims Turner owes for pre-2008 changes in scope and costs resulting from various inefficiencies. However, the subcontract required TIPS to submit written change orders for such costs under the fixed price scheme, and it is undisputed that TIPS did not submit written change orders to Turner referencing these costs. TIPS instead claims that Turner made oral representations to TIPS promising payment and disputes that the fixed price scheme made TIPS responsible for the costs of additional labor.

¶32      i. Fixed Price vs. Time and Materials Contracts

¶33 Initially, TIPS's argument mischaracterizes the nature of fixed price contracts, and the District Court concluded that costs for additional personnel and inefficiencies were the express responsibility of TIPS under the fixed price subcontract. As noted, the nature of fixed price contracts placed the burden of additional or unexpected costs on TIPS. *See Sperry Rand Corp. v. United States*, 201 Ct. Cl. 169, 181, 475 F.2d 1168 (1973) ("Absent unusual circumstances, a 'fixed-price [subcontractor] . . . shoulders the responsibility for unexpected losses, as well as for his failure to appreciate the problems of the undertaking . . . .' "); Bruner & O'Connor, *Bruner & O'Connor on Construction Law*, § 6:71, 621-22 (noting that under a fixed price contract, "[i]f the work is more expensive than anticipated, that too is the [subcontractor's] sole risk."). The subcontract specifically provided that TIPS would bear the cost of all labor and materials resulting from local conditions or changes in scope, *unless it submitted a written change order*. By contrast, under time and materials invoicing, "the [subcontractor] receives reimbursement *for the costs it incurs*, plus a fee." Bruner & O'Connor, *Bruner & O'Connor on Construction Law*,

§ 6:81, 639-40 (emphasis added). Indeed, the parties' contract revision switching to time and materials reflected this difference, as it paid TIPS's workers on a cost-plus hourly basis.

¶34 Recognizing the difference between fixed price and time and materials contracts, it is clear the fixed price subcontract did not intend to compensate TIPS for the costs of additional labor, inefficiencies, or local conditions without a written change order. Under the fixed price scheme, TIPS only realized compensation for additional labor if the extra workers increased TIPS's percent of completion. Moreover, Turner was free to increase the scope of work under the terms of the subcontract, and TIPS was required to submit written change orders for "all costs and time extensions" associated with these requests. As it was undisputed that TIPS did not submit written change orders for the costs at issue, the court correctly concluded that alleged inefficiencies and additional labor were the sole responsibility of TIPS under fixed price invoicing.

¶35     ii.  The Alleged Oral Modifications

¶36 Despite the foregoing, TIPS contends that it is owed payment for inefficiencies and changes in scope because Turner made oral promises of payment that should be considered executed oral modifications. In support of this argument, TIPS asserts Turner should not be allowed to avoid executing these oral agreements by withholding payment, citing our decisions in *Dalakow v. Geery*, 132 Mont. 457, 318 P.2d 253 (1957), and *Lewistown Miller*.

¶37 TIPS's reliance on *Dalakow* and *Lewistown Miller* is misplaced. In *Dalakow* and *Lewistown Miller,* we recognized that while only *executed* oral agreements may modify a written contract, § 28-2-1602, MCA, one side's refusal to pay following an oral request for services did not prevent a valid oral modification "merely because of that fact." *Dalakow*,

12

132 Mont. at 464, 318 P.2d at 258; *see also Lewistown Miller Constr. Co.*, ¶ 23. TIPS argues Turner orally promised payment for additional labor and, following *Dalakow* and *Lewistown Miller*, it should not be allowed to avoid allegedly valid oral modifications by withholding payment.

¶38 However, in *Dalakow*, we found that "the record [was] replete" with evidence that the defendant knew an oral modification had been effected, *Dalakow*, 132 Mont. at 464, 318 P.2d at 258, and evidence of oral requests was similarly "unequivocal" in *Lewistown Miller*, ¶ 19. TIPS failed to provide similar evidence that Turner understood it was responsible for compensating TIPS for additional labor under fixed price invoicing without written change orders. Indeed, TIPS was responsible for the cost of labor under the subcontract, and TIPS failed to establish evidence of oral agreements to the contrary.

¶39 TIPS's claims are also contradicted by the testimony of Ted Estraca ("Estraca"), President of TIPS. Estraca's testimony indicates that he did not understand Turner's communications to say that Turner would pay the additional workers brought on in January outside of the payments provided according to the subcontract's fixed price scheme. Estraca also testified that when Turner asked TIPS to increase manpower in January he asked to convert to time and materials, but Turner said no, revealing that both parties understood that the additional labor was TIPS's responsibility. This testimony cannot be reconciled with TIPS's claim to the contrary, and Estraca admitted that TIPS did not submit written change orders for the costs of "manning up." Thus, the record does not support TIPS's claims for additional pay prior to February 4, 2008, and we find that the District Court correctly dismissed TIPS's claims.

¶40    c. TIPS's Claimed Additional Pay for January 2008

¶41    TIPS finally claims Turner owes pay for additional labor provided between January 1 and February 4, 2008. The District Court found that TIPS failed to prove non-payment for any additional work performed by TIPS that complied with "the plain language" of the subcontract requiring written change orders. Again, the subcontract expressly required TIPS to submit written change orders for costs, like those for additional labor, incurred in response to Turner's changes in scope. Also again, TIPS admits it did not submit any change orders referencing these costs. It is further undisputed that time and materials invoicing did not begin until February 4, 2008. Thus, in January of 2008, TIPS was working under a fixed price contract. As we noted, fixed price contracts place all responsibility for additional costs on the subcontractor, namely TIPS. Because TIPS's claimed costs for additional labor occurred under the fixed price contract without the necessary written change orders, and because TIPS failed to establish oral agreements providing payment for these costs, we hold that the District Court correctly concluded these costs "were the responsibility of TIPS."

¶42    *2. Did the District Court err by failing to find that TIPS was the prevailing party and awarding costs and fees to Turner?*

¶43    TIPS claims the District Court abused its discretion by concluding Turner was the prevailing party in the litigation. We have previously held that the " 'prevailing party is the one who has an affirmative judgment rendered in his favor *at the conclusion of the entire case*.' " *Avanta Fed. Credit Union v. Shupak*, 2009 MT 458, ¶ 49, 354 Mont. 372, 223 P.3d 863 (emphasis added). We have also recognized that a money award is not dispositive in this determination. *E.C.A. Envtl. Management Servs. v. Toenyes*, 208 Mont. 336, 345, 679

14

P.2d 213 (1984). In essence, TIPS claims that it is the prevailing party because the court granted its motion for partial summary judgment and found that TIPS was entitled to the retainage once Turner had posted a substitution bond. However, the court's grant of TIPS's Motion for Partial Summary Judgment was not an affirmative judgment rendered at the conclusion of the entire case, but was rather an interlocutory order determining a subordinate question that did not finally decide the case TIPS alleged in its complaint. *See* M. R. App. P. 4(1)(b); *Farmers Union Mut. Ins. Co. v. Bodell*, 2008 MT 363, ¶ 16, 346 Mont. 414, 197 P.3d 913. As such, the court's order granting TIPS's motion for the retainage did not make TIPS the prevailing party in the litigation, and TIPS ultimately lost on each count of its complaint when a final decision was rendered. We therefore affirm the District Court's decision that TIPS was not the prevailing party and was not entitled to costs and fees.

¶44 *3. Did the District Court err by finding TIPS's construction lien was barred by the 90 day filing deadline found in § 71-3-535, MCA?*

¶45 The District Court found that TIPS's construction lien was filed at least one day after the 90 day statute of limitations found in § 71-3-535, MCA. The statute directs that a construction lien must be filed "not later than 90 days after" the person's "final furnishing of services or materials" or the owner files a notice of completion. Section 71-3-535(1), MCA. Here, the District Court found that Turner left the job site on June 25, 2008, and that while TIPS continued to work at the refinery, it did so under a series of purchase order contracts with CHS and not under the Turner subcontract. Because TIPS filed the construction lien on September 24, 2008, 91 days after the Court determined TIPS had stopped working for Turner, the Court found that the lien was barred by operation of law. We agree.

15

¶46    TIPS claims the court erred by finding that TIPS was off the site no later than June 25, 2008. In support, TIPS claims that the court ignored testimony that TIPS was on the job site after June 25th, and argues that because it "was performing essentially the same insulation duties before and after Turner left the site," its later work for CHS should provide the relevant date for § 71-3-535(1), MCA. TIPS finally claims the court erred by relying on hearsay to find a separate contract existed.

¶47    Conversely, Turner argues TIPS's work under the subcontract ended on June 25, 2008. In support, Turner proffered a notice of final completion sent to CHS dated June 24, 2008. Turner also argues that TIPS entered into a separate contract with CHS after June 25th, and asserts this work therefore did not toll the 90 day time limit with respect to the Turner subcontract.

¶48    The court based its finding that TIPS finished its obligations under the Turner subcontract prior to June 25, 2008, on Turner's June 24, 2008, Notice of Completion, evidence that the last payment Turner made to TIPS was for work on June 25th, testimony by TIPS Project Superintendant Rumaldo Herrera that TIPS left the site on June 25th and began insulating for CHS on June 30th, testimony by Richard Day that TIPS was off the site on June 25th, and an affidavit by Pat Kimmet, CHS plant manager, that TIPS's work after June 25th was under a separate CHS contract.

¶49    As noted above, we review the court's findings of fact for clear error. A finding of a trial court sitting without a jury is clearly erroneous if it is not supported by substantial credible evidence, if the trial court misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that the trial court made

16

a mistake. *Lewistown Miller Constr. Co.*, ¶ 15. From a review of the record, it is clear that the court's findings concerning the timeliness of the lien were supported by substantial credible evidence. Several parties testified that TIPS left the job site, and completed the subcontract with Turner, by June 25, 2008. TIPS's own Project Superintendant testified that the company quit insulating under Turner on June 25, 2008, and TIPS's Estraca testified that after Turner left, TIPS submitted an estimate to CHS and CHS issued a separate purchase order for TIPS's work. Significantly, Turner's admitted final notice of completion clearly shows a date of June 24, 2008. It was not clear error for the court to find TIPS finished working under Turner on June 25, 2008.

¶50    We are also not persuaded by TIPS's argument that the District Court erred by finding that its work at the refinery after June 25, 2008, was under a separate contract and could not toll the 90 day time limit. It is well-established that if work is performed under separate contracts, " 'the lien should be filed within the time prescribed by the statute after the delivery under each of such contracts.' " *See Frank J. Trunk & Son v. De Haan*, 143 Mont. 442, 445, 391 P.2d 353 (1964), *quoting Helena Steam-Heating & Supply Co. v. Wells*, 16 Mont. 65, 69, 40 P. 78 (1895). It is a question of fact whether work was finished under one or more contracts, *Frank J. Trunk & Son*, 143 Mont. at 445-46, 391 P.2d at 355, and the District Court did not commit clear error by finding TIPS's work after June 25th was under a separate contract. Both sides agree that Turner left the site on June 25th, and it is undisputed that CHS paid TIPS under separate purchase orders for its later work. TIPS Superintendant Herrera stated that TIPS began work on June 30th under CHS, and testimony by Mr. Day, Superintendant for Turner, established that the last day of the job was "Wednesday the 25th"

17

of June and that no TIPS personnel were left working on site. Further, TIPS Invoice # 1971, admitted at trial, clearly shows that TIPS submitted 330 hours of work for Turner on June 25, 2008, and none thereafter. This was confirmed by Turner's project engineer, Mr. Stampley, who testified that Invoice 1971 was the last invoice Turner processed for TIPS labor at the refinery, and by Plaintiff's Exhibit 73, which shows TIPS billed CHS, not Turner, for its work starting June 30th. Based on this review of the record, we conclude that it was not clearly erroneous for the court to find that TIPS operated under a separate contract with CHS after June 25, 2008.

¶51 TIPS is also incorrect to argue that the District Court solely relied on inadmissible hearsay to find that TIPS's work after June 25th came under a separate contract. A review of the court's findings shows the court referenced testimony by Mr. Herrera, testimony by Mr. Day, invoices, and admitted correspondence between CHS and Turner, *in addition to* the Pat Kimmet affidavit. Even if, as TIPS claims, the Kimmet affidavit was inadmissible hearsay, its reference by the trial court was harmless error because the finding was supported by other admissible evidence that proved the same facts. M. R. Civ. P. 61; *State v. Sanchez*, 2008 MT 27, ¶ 22, 341 Mont. 240, 177 P.3d 444.

¶52 In light of the foregoing, we find that the court correctly concluded that because TIPS filed its construction lien on September 24, 2008, 91 days after it furnished services under the Turner subcontract, the lien was barred by operation of law. *See* Section 71-3-535(1), MCA; *Johnston v. Palmer*, 2007 MT 99, ¶ 33, 337 Mont. 101, 158 P.3d 998 (requiring that the procedural requirements for construction liens be strictly followed).

18

¶53    *4. Did the District Court err by granting partial summary judgment to TIPS and ordering Turner to return the retainage?*

¶54    Turner cross-appeals the District Court's grant of TIPS's motion for partial summary judgment seeking the return of contractual retainage. Turner asserts that the District Court erred because the subcontract authorized retaining money in anticipation and defense of "any lien or claim." In granting TIPS's motion for partial summary judgment on the retainage, the District Court found that because Turner had filed a substitution bond in lieu of TIPS's lien, the lien was discharged by operation of § 71-3-552, MCA. Section 71-3-552, MCA, provides that "[u]pon the filing of a bond as provided in 71-3-551, the lien against the real property shall forthwith be discharged and released in full and the bond shall be substituted for such lien." The District Court thus concluded that by filing a substitution bond, Turner obviated the need for TIPS to submit a final release of lien because § 71-3-552, MCA, effected a release by operation of law.

¶55    Here, the subcontract allowed Turner to withhold 10 percent of payments to TIPS as retainage until TIPS provided "a final release of lien." Turner had retained $364,757.32 when TIPS filed its construction lien on September 24, 2008. Turner subsequently filed a substitution bond in an amount 1.5 times the lien. Section 71-3-551, MCA, provides that a "contracting owner of any interest in the property" may file a bond in an amount 1.5 times the lien, and § 71-3-552, MCA, declares that this bond discharges and releases the lien in full. However, Turner is not a "contracting owner" pursuant to § 71-3-522(4)(a), MCA, and therefore does not fall within the operation of § 71-3-551, MCA. While this is so, it is generally recognized that the purpose of allowing a construction lien to attach to a release

19

bond is to "allow the property to be entirely free of liens" and allow "a general contractor, acting on the owner's behalf, to substitute a bond for the property." 53 Am. Jur. 2d *Mechanics' Liens* § 307 (2012); *see also AAA Constr. of Missoula, LLC v. Choice Land Corp.*, 2011 MT 262, ¶ 33, 362 Mont. 264, 264 P.3d 709 ("[A] bond 'does not change the relation or rights of the parties otherwise than in substituting its obligations for the [property] subject to the lien . . . .' "); *Hutnick v. United States Fidelity & Guaranty Co.*, 47 Cal. 3d 456, 462, 763 P.2d 1326, 1330 (1988). This intent was demonstrated by the parties' stipulation dismissing CHS from the case, which can be seen as the parties acquiescing to the release of the lien in light of Turner's bond. Turner therefore may not now oppose the return of the retainage by asserting TIPS has not filed a final release of lien. The subcontract authorized Turner to hold the retainage until a final release of lien, but a release was made superfluous by the parties' actions. We accordingly affirm the District Court's grant of TIPS's motion for partial summary judgment on the retainage.

¶56 TIPS in turn claims it is owed prejudgment interest on the retainage, arguing that the court's decision to the contrary was clear error. TIPS alleges that interest is appropriate because the retainage was a liquidated sum payable under a construction contract, citing *James Talcott Constr., Inc. v. P&D Land Enterprises*, 2006 MT 188, 333 Mont. 107, 141 P.3d 1200, while also claiming that the subcontract's silence on retainage interest is immaterial. The District Court rejected TIPS's claim, finding that as "[t]he Subcontract does not provide for payment of interest on retainage," TIPS is not owed interest on the $374,225.82 that Turner withheld. Turner argues that the retainage is a cost of business and

20

that Subsections 16.2 and 16.6 authorized withholding money pending litigation, but did not permit any payment of interest.

¶57    A district court's decision concerning prejudgment interest is a question of law, and as such, we review it for correctness. *Am. Music Co. v. Higbee*, 2004 MT 349, ¶ 13, 324 Mont. 348, 103 P.3d 518. Here, the court denied TIPS's claim for interest because of the lack of contractual language authorizing it. We conclude that this denial was incorrect.

¶58    Here, Turner filed the substitution bond in November of 2008, and, as noted above, this bond discharged TIPS's lien by operation of law. Because a final release of lien was rendered unnecessary by the substitution bond, Turner was required to remit the retainage once the bond was filed. However, Turner failed to do so until so ordered by the District Court on October 12, 2010.

¶59    A party is entitled to prejudgment interest if they establish "(1) the existence of an underlying monetary obligation; (2) the amount of recovery is certain or capable of being made certain by calculation; and (3) the right to recover the obligation vests on a particular day." *Talcott*, ¶ 40. Moreover, § 27-1-211, MCA, provides a right to prejudgment interest that arises independent of contractual authorization, *see Turner*, ¶ 44, and the statute "mandates interest as long as the legal situation fits within the broad guidelines of the statute." *Price Bldg. Serv. v. Holms*, 214 Mont. 456, 469, 693 P.2d 553, 560 (1985). Thus, a party is entitled to interest on "amounts capable of being made certain" that are required "in order to make [the party] whole." *Talcott*, ¶¶ 44, 46. Here, Turner's substitution bond discharged the lien in November of 2008, and Turner no longer had a right to keep the retainage. Turner therefore wrongly withheld $374,225.82 from TIPS, and it did not raise

issues concerning the quality or completeness of TIPS's work as a possible justification. As the overriding purpose of § 27-1-211, MCA, is "to fully compensate the injured party for the loss of use of his money during the period in which a valid claim was not paid," *Holms*, 214 Mont. at 469, we conclude that TIPS is entitled to interest at the legal rate on the retainage from the date the bond was filed until the court's October 12, 2010 order. The decision of the District Court is therefore reversed and we remand to the District Court with instruction to determine the dollar value of 10% interest on the retainage from the November 2008 filing of the substitution bond until October 12, 2010.

¶60    *5. Did the District Court err by dismissing Turner's bill of costs for being untimely filed pursuant to § 25-10-501, MCA?*

¶61    The District Court dismissed and denied Turner's bill of costs, finding it was filed after the statutory deadline, lacked a signature or notary, and was "unintelligible and not in a form of separately delineated costs pursuant to § 25-10-501." On appeal, Turner argues that Subsection 24 of the subcontract displaces the requirements of § 25-10-501, MCA, based on freedom of contract, citing *Arrowhead Sch. Dist. No. 75 v. Klyap*, 2003 MT 294, ¶ 20, 318 Mont. 103, 79 P.3d 250. Turner alternatively claims that the bill of costs was timely filed because the court failed to file a separate judgment pursuant to M. R. Civ. P. 58(a) until January 16, 2012. We review a court's order concerning costs for an abuse of discretion, *Hitshew v. Butte/Silver Bow County*, 1999 MT 26, ¶ 29, 293 Mont. 212, 974 P.2d 650, and a district court's application of a statute in determining entitlement to costs is a question of law reviewed for correctness. *Neal v. State*, 2003 MT 53, ¶ 4, 314 Mont. 357, 66 P.3d 280.

¶62    a. Application of Title 25, Chapter 10, MCA, to Turner's Claimed Costs

22

¶63 At the outset, a party's entitlement to costs in a civil action is governed by Title 25, chapter 10, MCA. Under chapter 10, a defendant must be allowed costs "upon a judgment in the defendant's favor in the actions mentioned in 25-10-101." Section 25-10-102, MCA. One of the "actions" mentioned in § 25-10-101, MCA, is "an action for the recovery of money or damages, exclusive of interest, when a plaintiff recovers over $50." Section 25-10-101(3), MCA. We previously construed the interaction of § 25-10-101 and -102, MCA, in *Rodgers v. Mony Life Ins. Co.*, 2005 MT 290, 329 Mont. 289, 124 P.3d 137. There, we found that a defendant may recover costs by way of § 25-10-102, MCA's reference to § 25-10-101(3), MCA, *even if the plaintiff does not recover $50. Rodgers*, ¶ 21. We reasoned the relevant action specified in § 25-10-101(3), MCA, is " 'an action for the recovery of money or damages,' " and concluded that "[t]he language, 'when plaintiff recovers over $ 50[]' does not change the type of action." *Rodgers*, ¶ 21. We found that the latter clause was "only applicable to a plaintiff," and concluded that if we were to interpret it as applicable to the defendant, "a defendant could never recover costs in an action for recovery of money or damages. Such is not the intent of the Legislature." *Rodgers*, ¶ 21. As TIPS's claim against Turner is clearly an action for money or damages under § 25-10-101(3), MCA, Turner's claim for costs is enabled by § 25-10-102, MCA, and our decision in *Rodgers*.

¶64 While *Rodgers* and § 25-10-102, MCA, establish a statutory basis for Turner's claim for costs, we have frequently allowed parties to contract for costs not allowed by Title 25, chapter 10. Section 25-10-201, MCA, enumerates the types of costs "generally allowable" in a party's bill of costs, but we have long held that the list of items in that section "is exclusive

23

*except as to cases taken out of its operation* by special statute, by stipulation of parties, or by rule of court." *Roseneau Foods v. Coleman*, 140 Mont. 572, 580, 374 P.2d 87 (1962) (emphasis added); *accord Kuhr v. City of Billings*, 2007 MT 201, ¶ 37, 338 Mont. 402, 168 P.3d 615; *Springer v. Becker*, 284 Mont. 267, 275, 943 P.2d 1300 (1997); *Masonovich v. School Dist.*, 178 Mont. 138, 140, 582 P.2d 1234 (1978). Subsection 24 of the subcontract is such a stipulation allowing costs, and reads:

> Should CONTRACTOR employ an attorney to enforce any of the provisions hereof, or to protect its interest in any matter arising under this SUBCONTRACT, or to collect damages for the breach of this SUBCONTRACT, or to prosecute or defend any suit resulting from this SUBCONTRACT or to recover on the performance bond given by SUBCONTRACTOR under this SUBCONTRACT, SUBCONTRACTOR and his surety, jointly, and severally, agree to pay CONTRACTOR all reasonable costs and attorney's fees expended or incurred therein.

Thus, while Turner's bill of costs falls within the ambit of § 25-10-102, MCA, following our decision in *Rodgers*, Turner and TIPS have also entered into a stipulation allowing costs regardless of statutory authority, a practice that we have frequently upheld.

¶65　However, while we have long recognized a party's freedom to contract for costs not allowed by § 25-10-201, MCA, the District Court's denial of Turner's bill of costs *was based on the procedural requirements* of § 25-10-501, MCA. Section 25-10-501, MCA, specifically requires:

> The party in whose favor judgment is rendered and who claims the party's costs shall deliver to the clerk and serve upon the adverse party, *within 5 days after the verdict or notice of the decision of the court* . . . a memorandum of the items of the party's costs. . . . The memorandum *must be verified by the oath of the party, the party's attorney or agent, or the clerk of the party's attorney* . . . .

24

Section 25-10-501, MCA (emphasis added). Here, the District Court issued its final Findings of Fact and Conclusions of Law on November 22, 2011. Turner filed a notice of entry judgment on November 29, 2011. This notice both acknowledged the date of the judgment and attached a copy of it. Turner filed its bill of costs, without either a signature or notary, on December 12, 2011, well more than 5 days after Turner had notice of the judgment. Turner clearly failed to adhere to the requirements of § 25-10-501, MCA, and failure to file a timely bill of costs results in waiver of the right to receive an award of costs. *Pastimes, LLC v. Clavin*, 2012 MT 29, ¶ 38, 364 Mont. 109, 274 P.3d 714. However, on appeal Turner challenges the court's application of § 25-10-501, MCA, to the subcontract.

¶66    In essence, Turner argues that Subsection 24 of the subcontract displaced the procedural requirements of § 25-10-501, MCA. As support, Turner cites our prior holdings that parties are free to contract *what* costs may be awarded. *See Kuhr*, ¶ 37 ("Section 25-10-201, MCA, is an exclusive list of costs which may be taxed to an opponent unless the case is taken out of its operation by a more specialized statute, by stipulation of the parties, or by rule of the court."); *Bovee v. Helland*, 52 Mont. 151, 155, 156 P. 416, 417 (1916). Thus, following *Kuhr*, Turner claims Subsection 24 of the subcontract is a stipulation that displaces § 25-10-501, MCA, despite the *Kuhr* decision's clear reference to § 25-10-201, MCA. Indeed, § 25-10-501, MCA, concerns the form, not the substance, of a bill of costs. Turner's citation to our previous decisions upholding contractual stipulations for costs beyond those allowed under § 25-10-201, MCA, is therefore misplaced. Deciding *what procedures* govern filing a bill of costs is a different question than determining *what costs*

25

are allowed either by operation of Title 25, chapter 10 or by stipulation of the parties. Turner's citations regarding the latter question are therefore unpersuasive.

¶67    Instead, we have previously found that "Section 25-10-501, MCA, provides the procedure for which the party in whose favor judgment is rendered claims his costs," and routinely hold parties to its requirements. *Sage v. Rogers*, 257 Mont. 229, 242, 848 P.2d 1034 (1993); *see also Doyle v. Clarke*, 2011 MT 117, ¶ 40, 360 Mont. 450, 254 P.3d 570; *Kuhr* ¶ 38, ("§ 25-10-501, MCA, [controls] when a party was required to file his or her memorandum of costs."); *McDermott v. Carie*, 2005 MT 293, ¶ 26, 329 Mont. 295, 124 P.3d 168 (finding § 25-10-501, MCA, requires a notary to verify the oath, and concluding that failure to properly swear to the accuracy of the bill renders it invalid). We reiterated the broad applicability of § 25-10-501, MCA, in *In re Estate of Lande*, 1999 MT 179, 295 Mont. 277, 983 P.2d 316. There, we recognized:

> By its caption, and by the terms of the statutes contained therein, [Title 25, chapter 10,] Part 5 provides the means and manner in which costs are to be claimed. Nothing in those statutes makes a distinction or exception for costs being claimed in different types of actions. . . . The language of the statute is plain and unequivocal in encompassing *all claims for costs*.

*In re Lande*, ¶ 22 (emphasis added). Section 25-10-501, MCA, clearly applied to Turner's bill of costs.

¶68    Additionally, even if we were to accept Turner's argument that Subsection 24's allowance of costs displaces § 25-10-501, MCA, the subcontract's language is utterly devoid of any indication whatsoever of what procedures the parties intended to replace those found in § 25-10-501, MCA. We all recognize the language of a contract governs its interpretation, however there is nothing in Subsection 24 that either addresses or purports to replace the

26

requirements of § 25-10-501, MCA. Accepting Turner's argument would therefore require us to infer that the *lack* of contractual procedures for filing a bill of costs necessarily implies that the parties had some other procedures in mind. What those procedures would be, however, is a mystery. Without the application of § 25-10-501, MCA, to the subcontract, Turner would seemingly be free to submit the bill of costs at any time, in any form, and without either Turner or Turner's counsel attesting to its accuracy. We have previously recognized that the requirements of § 25-10-501, MCA, serve an important informational function, in that filing a bill of costs pursuant to § 25-10-501, MCA, facilitates the uniform, timely notification of what costs are claimed and enables the opposing party to enter an objection. *See Sherner v. Nat'l Loss Control Servs. Corp.*, 2005 MT 284, ¶ 55, 329 Mont. 247, 124 P.3d 150. Accepting Turner's argument would therefore run contrary to the clear purposes of § 25-10-501, MCA. *Sherner*, ¶ 55.

¶69 In light of the plain language of the subcontract, we cannot conclude that the parties intended to displace the procedural requirements of § 25-10-501, MCA. This decision does not restrict the parties' freedom of contract. *See Klyap*, ¶ 20. Because the subcontract contained *no procedural* language concerning how to file the bill of costs, it could not displace § 25-10-501, MCA. We conclude that Turner was correctly required to abide by the procedures contained in § 25-10-501, MCA, and therefore hold that the District Court's denial of Turner's bill of costs was not an abuse of discretion.

¶70    b.  Effect of M. R. Civ. P. 58(a)

¶71    We also disagree that Turner's bill of costs was nonetheless timely filed. Turner claims that because it filed a bill of costs on January 20, 2012, five days after the court issued

27

its January 16, 2012 Notice of Entry of Judgment, we must reverse the District Court's order dismissing and denying their claim for costs. However, to do so we would have to disregard both Turner's prior recognition of the November 22, 2012 date of judgment and our holdings interpreting the language of § 25-10-501, MCA.

¶72    First, Turner filed a notice of entry of judgment on November 29, 2011, acknowledging November 22, 2011, as the date of judgment. Turner now argues that we should disregard this "premature" filing made before its counsel engaged in "close review of the newly revised Montana Rules of Civil Procedure." As the District Court observed, "Turner not only filed a notice of entry of judgment but referred to the Court's Findings and Conclusions as a judgment. That judgment was from November 22, 2011." Turner is bound by this recognition.

¶73    Second, § 25-10-501, MCA, requires a bill of costs to be delivered to the clerk and served upon the adverse party "within 5 days after the verdict *or notice of the decision of the court* . . . ." We have previously found that "notice" under the statute "indicated knowledge of the court's decision and that formal notification was not necessary." *Karell v. American Cancer Soc'y*, 239 Mont. 168, 176-77, 779 P.2d 506 (1989); *accord Shull v. Lewis & Clark County*, 93 Mont. 408, 419, 19 P.2d 901 (1933); *Miles v. Miles*, 76 Mont. 375, 382, 247 P. 328 (1926). Turner had notice of the decision of the court at least at the time it filed its notice of entry of judgment on November 29, 2011. Turner's earliest bill of costs, filed December 12, 2011, and received by TIPS no earlier than December 9, 2011, came more than five days after this date. We therefore find that the District Court's order denying and

28

dismissing Turner's bill of costs as untimely was not an abuse of discretion and affirm its decision.

## CONCLUSION

¶74     We accordingly affirm the decisions of the District Court regarding TIPS's claims for additional compensation, TIPS's claim it was the prevailing party, whether the construction lien was time barred, the return of the retainage, and Turner's bill of costs.  We reverse the District Court's decision denying TIPS prejudgment interest on the retainage.

¶75     Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ Michael E Wheat

We Concur:

/S/ Patricia O. Cotter
/S/ Jim Rice
/S/ Beth Baker
/S/ Brian Morris